Filed 11/9/15  P. v. Delossantos CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040746 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. F1243045) |
| v. | |
| BELMAR DELOSSANTOS, | |
| Defendant and Appellant. | |

Defendant Belmar Delossantos was charged and convicted of six counts of violating Penal Code section 288.7, subdivision (a).[1]  Counts 1 through 5 alleged that defendant, who was 18 years of age or older, engaged in sexual intercourse with a child 10 years of age or younger, specifically Y. Doe[2] (hereafter Y.) who was 6 years of age. Count 6 alleged defendant, who was 18 years of age or older, engaged in sodomy with the same six-year-old child.  All the charged offenses allegedly occurred during the same time period in 2012.  The court sentenced defendant to 25 years to life on each count, to be served consecutively.

On appeal, defendant asserts that his confession was involuntary and his trial counsel rendered ineffective assistance by not investigating the option of using a false confession expert and retaining and calling such expert at trial.  He also asserts that the evidence was insufficient to prove the crime charged in count 5 and the trial court erred

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] We refer to the victim by her first initial for privacy reasons.

by not instructing sua sponte on an attempted violation of section 288.7, subdivision (a), as a lesser included offense of the crime charged in count 5.

We find no error and will affirm the judgment.

*Discussion*

A. *Defendant's Confession*

1. *Proceedings Below*

Defendant filed a written pretrial motion to exclude his confession, alleging that he had not been properly advised of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 and his confession was unreliable. As part of the unreliability argument, it was asserted that "[f]ederal [c]ases. . . have held that confessions are involuntary when officers make promises that the statements will not be used to arrest them or will be 'off the record.' " It was also stated that federal courts have "recognized that telling suspects that DNA exist[s] [that] points to them induce[s] false and unreliable confessions."

The court heard testimony from Corporal Jason Smith, a Gilroy police officer, who had been assigned as a sexual assault investigator in June 2012. The court listened to the audio recording of the consensual contact with defendant on June 20, 2012 and watched the DVD recording of Smith's subsequent interview of defendant in the police department on June 20, 2012. The conversations were in English.

During a consensual contact with defendant on the street, defendant agreed to come to the police department to talk with Smith. Defendant accepted the offer of a ride there. When they arrived in the police department's interview room, Smith asked defendant whether he minded Smith shutting the door for privacy.

At the beginning of the DVD recording, Smith thanked defendant for coming and told defendant that he was not under arrest and he was free to go at any time. He explained to defendant that the door was closed for privacy and he said, and showed defendant, the door was unlocked. He told defendant that "if at any time you don't want to talk, just say I'm done talking and I'll show you the way out." Smith also said that, if

2

defendant needed water, to use the bathroom, or anything else, defendant should just let him know and he would help defendant. Smith indicated that he would make sure defendant's "needs get met." He told defendant, "No matter what you tell me, I'm not going to arrest you." Smtih told defendant that he just wanted to have an open and honest conversation and reassured defendant that his word was good and, at the end, defendant would go home if that was where defendant wanted to go.

Smith obtained some basic information about defendant, Y.'s mother, the baby son, C., they had together, and the mother's other children. Defendant indicated that he had been going out with Y.'s mother for about three years and their baby was about a year old. They did not live together but defendant stopped by to help with the baby. Defendant thought Y. was five years old; she had just finished kindergarten.

Smith reiterated that, no matter what they talked about, he was not going to arrest defendant. Smith stated that defendant was going to go home, or wherever he was going to go, and he was going to leave free, whenever he chose to do that. Smith told defendant he just wanted him to be open and honest about things. Smith asked the defendant to tell him what happened.

Defendant initially indicated that Y.'s little cousin had made false allegations against him. He indicated that Y. was saying he did things to her in the morning and he did not know why she was making things up.

After talking about how defendant helped with the baby and Y.'s family, Smith told defendant that the most important thing that defendant could do when they talked was to "just be honest about things." Smith said that he talks to a lot of good people who made "some pretty bad mistakes" but that did not mean they are bad people; it just meant they are human. Smith said we all make mistakes. He indicated that a lot of these people were still his friends because they were good people who had made bad mistakes. He implied they were different from bad people who made bad mistakes.

3

Smith told defendant that he seemed like a pretty nice guy. Defendant said that he had told Y.'s mom that he never did anything and asked Smith why would he do things he knew he should not be doing. After talking for a while, Smith suggested that sometimes things just happen, that is just how life is, not everything is planned. He suggested that sometimes people do something and then ask themselves, "Why did I do that?" Smith indicated that he did not look down on anybody that was in the interview room with him because it could be anybody making the same mistake.

Smith said he did not think defendant was a bad person and indicated that he would not have invited defendant to the police department if he thought defendant was a bad person. If Smith had thought defendant was a bad person, he probably would have arrested defendant and talked afterward. Smith said that he thought that defendant was the kind of person with whom they could talk and figure out what was going on and to whom they could say how can we stop doing this in the future.

Smith indicated that it was really important for defendant, not just for Y., to just put everything on the table. He reassured defendant that his word was good and that, no matter what they talked about, defendant would go home or wherever he chose to go. Defendant said he had nothing to hide. Smith suggested that defendant had the decency to come down and talk and indicated that he respected the fact that defendant wanted to deal with it.

Smith disclosed that they deal with a lot of these situations and defendant was not alone in being in that room. Smith said that he truly believed that there is help for people if they want it. Smith indicated that he thought defendant was not one of those people who are sick and have to hurt children; he just thought that defendant had made a couple of mistakes and he wanted to make sure that he felt okay with defendant being around kids.

Smith reminded defendant that he had talked to Y. about what had been going on and there was no doubt that bad things had happened but it was his hope that it would not

4

happen again and there were "no other kids that it's happened to." Smith wanted to make sure that it was something that defendant acknowledged and for which defendant hopefully would want to get help. He said it was a large weight for defendant to carry around and he didn't think that was fair. Smith suggested that maybe they could get Y. into counseling or maybe she was so young she would not remember. He wanted defendant to be honest about what happened, not just for her, but for himself.

Smith said that he knew that defendant did things to her and "things happened." He wanted to understand what happened and how it happened and he wanted defendant to promise him that it would never happen again. Defendant said, "It never happened." Smith responded that we know it happened and we just do not want it to happen again.

Smith reminded defendant that he had talked with Y. about everything and said, "We know what you've done." He said, "She went down and got an exam today, right, and that exam shows evidence, right? Does that make sense to you?" Defendant responded, "Yeah." Smith emphasized that "little kids don't lie about stuff like" this. He said he wanted defendant to start being honest and defendant needed to tell him what happened with her and tell him that it would not happen again if that was the truth. Smith asked, "So what happened with her?" Defendant admitted that, as he had told Y.'s mother, it happened just once about six month ago.

Smith acknowledged that it was a hard thing to be honest about and he indicated that he respected and appreciated defendant's honesty. Defendant promised he would not do it again and said, "after this, if I had to go to jail—" Smith said that his word was good. Defendant clarified, "That's what I'm saying. If I have to go, if I have to pay a price for that, I will pay it." Defendant said he had to be responsible with his child too and he did not want his child to grow up without a father.

Smith asked defendant to tell him what happened. Defendant described an incident that occurred after bathing Y. Smith acknowledged that it was a very hard thing to talk about, defendant had probably been going through a lot thinking about it, and

5

there was a lot of guilt and defendant admitted that was true. Defendant ultimately admitted that he rubbed Y.'s vagina with his hand, his finger went into her vagina a little bit, he rubbed his penis on her vagina, and he put his penis into her vagina "a little bit," about half a tip of a finger. Defendant admitted to being aroused at level one, just a little bit, on a scale of zero to 10. Defendant indicated that it happened shortly before Christmas.

Smith thanked defendant for being honest and acknowledged that was not an easy thing. Defendant disclosed that he really felt bad and he said, "If I have to pay for what I did, I mean I have to pay, you know. There's no doubt about that too. For me, you know." Smith reassured defendant that his word was good and said, "Like I told you, I mean, you're gonna walk out of here free." Defendant replied, "[T]hat's why I'm being honest with you too, you know?" Smith said, " I appreciate it." Defendant responded, "Not, not because of what you told me, that you were gonna let me go, I just wanna, you know—" Smith said, "Good for you." Defendant indicated that he just wanted to "let it go" and "start the life." Smith indicated that telling the truth means defendant has decency and is a good guy. Defendant said that he thinks that everybody is responsible for his own actions and that was why he was telling Smith about it.

The interview continued. Smith told defendant that he knew it happened more than once. He recognized that it was hard to talk about and he knew that defendant felt bad that anything happened, but now was the time to be honest about everything. He indicated that Y. did not deserve to be told that her dad says she is a liar and he reiterated that he wanted defendant to be honest. Smith said he needed defendant to tell him how many times it happened and exactly what he did to make sure Y. gets the help she needs. Smith told defendant that Y. still loves him and defendant did a couple of bad things but he also did "a mountain of good things."

In response to further questioning, defendant admitted that he had been molested as a little boy by his cousins in Mexico. Smith said, "[Y]ou know so many people we

talk to, I mean that's what happens, you know?  Something bad happens to them, and . . . it plants that little seed.  I'm sorry that happened to you.  But the good news is, is that we can talk about it.  We can talk about it and we can move on.  And we can make ourselves so much better of a person.  Right?"  Defendant appeared to be wiping tears away.  Smith said, "We can go up to today, stop, and then we can make just a whole new life.  But it starts with being honest, you know, and that that was a hard thing to tell me about."  Smith again said he was so sorry and suggested that "now you can think about how she feels."

Smith then asked, "How many times did this happen?"  Defendant answered, "Like four times."  Smith said he thought it might have been more than that and said, "I want you to think, and just, I mean, it doesn't matter if it was four times or a hundred times.  Whatever the truth is—"

Smith told defendant this was his chance to get it off his shoulders and defendant then admitted that there had been five or six times and each time he had done the "same thing."  Smith asked, "[D]id you ever put, put your penis further inside her?"  He indicated the exam of Y. had shown damage.  Defendant admitted that he put his penis in Y. and showed Smith how far with his fingers, but he insisted he never put his penis in more than an inch.

When asked if there was a total of five times, defendant said, "No, it was like six times, like I said five, six times."  He confirmed that it was the same every time.  Smith continued questioning defendant.  Defendant indicated that that incident they had talked about the most was about six months ago and it was probably the second time; the first time occurred around October.

Defendant denied that the last time was the day before the interview; he indicated that the last time was probably about a month ago, after school was out.  As to that most recent incident, defendant indicated that he had done the same thing.  He confirmed that he had put his penis inside Y.'s vagina about six times.

Defendant denied that he had put his finger in Y.'s vagina just a bit each time but he indicated that he had rubbed her vagina every time. Defendant confirmed that his finger went in a little bit during the incident around Christmas time and he admitted that his finger went in about four times. The interview continued.

Defendant admitted that, as to the most recent incident, he pulled Y.'s pants off and, after he asked her whether she wanted to take her panties off, she took off her panties. Defendant admitted that sometimes he took off her underwear. Defendant again confirmed that it happened a total of six times. He indicated it happened on the bed each time. He admitted that he kissed her vagina one time. He admitted to putting his penis in her "butt" one time. He admitted that, on that occasion, he put his penis in her vagina first and then inside her "butt." On a scale of zero to 10, the most sexually aroused or excited he had been with Y. was four and the least was one.

Defendant denied telling Y. not to tell anybody or to keep it a secret. He admitted that one time he had asked her whether she liked it while his penis was in her vagina.

Smith asked defendant if he was doing "okay" and whether he needed water or anything. Defendant said, "No, I'm okay." Smith said that he was glad that defendant was "man enough to come in" and "talk about it." Smith said defendant had "really earned" his respect. Defendant disclosed that he did not have the guts to talk to Y. Smith told defendant he did not have to and suggested that defendant write to Y. and her mother and provided paper. Smith reminded defendant that defendant was free to go at any time and to just let him know so he could let defendant out. He inquired whether defendant would like water and defendant said yes. Smith left defendant alone to write and defendant wrote two letters, one to Y. and one to her mother, in Spanish. Smith brought a water to defendant while defendant was writing and left again. When defendant was done, Smith returned and asked defendant whether he was doing okay.

Smith talked to defendant about learning English. Defendant had come to the United States when he was 10 years old and did not speak English. By the time he was in

8

junior high, defendant was speaking English. Defendant had gone to Watsonville High School. His high school classes had been in English.

Upon being asked, defendant indicated that there was nothing he did not understand, he had no questions, and he had told the absolute truth. He insisted that there were no additional times about which he had not told Smith.

At some point, defendant asked about counseling and Smith said counseling was an excellent idea because defendant had a lot that he needed to talk about. Smith indicated that it feels good to talk about it because defendant had these things bottled up for so long. He said, "I hope you feel some relief." Defendant answered, "I do."

The interview continued. Defendant again confirmed that everything he had told Smith was the truth. He indicated that he had not taken any drugs or alcohol.

Smith asked further questions. After the Smith asked how Y. had gotten onto the bed, defendant admitted he had hugged Y. and lifted her onto the bed about two times. He indicated that he had taken off her pants and underwear. The interview continued.

Smith told defendant that he appreciated defendant staying around and talking with him because defendant could leave at any time and thanked him. Defendant responded that he "just wanted to take everything out [*sic*] of [his] back too." In response to further questioning, defendant admitted that Y. had indicated "it hurt" two times, once by saying "ow."

Defendant agreed that the person who does something like this should be punished. He acknowledged that Y. was five years old and he was 31 years old.

Smith reminded defendant of his promise that defendant was going to leave the police station a free man no matter what defendant told him. Smith said that his word was 100 percent good. Smith explained that defendant could leave and he could write the police report and send it to the district attorney, who would review the report and decide whether to prosecute. If charges were filed, a warrant for defendant's arrest would be issued and he could be arrested at any time. Smith said he was extending the option to

9

defendant of surrendering himself and being booked on charges that night. Smith offered to walk defendant down to the jail without handcuffs. Smith said he would keep his word and the choice was completely defendant's.

Smith indicated that he thought surrendering that night was the better choice but he said that he had told defendant he was going to leave a free man and his word was good. Smith said the decision was defendant's and he was going to keep his word. It was eventually arranged for defendant to return the next day and turn himself in at 10:00 a.m. Defendant was served with an emergency protective order. Smith reiterated that his word was good and defendant was going home and he thanked defendant for coming down.

The trial court ruled on the defense motion to exclude defendant's confession. It concluded that *Miranda* warnings were not required because defendant was not in custody. The court found that defendant's confession was voluntary.

Immediately before trial, defense counsel again objected to the admission of defendant's confession, including the letters that defendant wrote to Y. and Y.'s mother. The court asked if there were any new grounds beyond those already presented to the court in the earlier defense motion. Defense counsel answered no and the court stated that "[t]he record is clear that you disagree with me."

2. *Background*

"Both the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial. [Citations.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1176.) "A defendant's admission or confession challenged as involuntary may not be introduced into evidence at trial unless the prosecution proves by a preponderance of the evidence that it was voluntary. (*Lego v. Twomey* (1972) 404 U.S. 477, 489; *People v. Markham* (1989) 49 Cal.3d 63, 71.)" (*People v. Williams* (1997) 16 Cal.4th 635, 659(*Williams*).) "In determining whether a confession was voluntary, ' "[t]he question is whether defendant's choice to confess was not 'essentially free'

because his [or her] will was overborne." ' [Citation.]"³ (*People v. Carrington* (2009) 47 Cal.4th 145, 169 (*Carrington*).)

In determining whether a confession is voluntary, "courts apply a 'totality of the circumstances' test, looking at the nature of the interrogation and the circumstances relating to the particular defendant. [Citations.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 752 (*Dykes*).) "[N]o single factor is dispositive. . . ." (*Williams*, *supra*, 16 Cal.4th at p. 661.) "With respect to the interrogation, among the factors to be considered are ' " 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' . . . ." ' (*People v. Massie* [(1998)] 19 Cal.4th [550,] 576.) With respect to the defendant, the relevant factors are ' " 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.' " ' (*Ibid.*)" (*Dykes*, *supra*, at p. 752.)

"[A]lthough coercive police conduct is a necessary predicate, such conduct does not compel a finding that the resulting statement is involuntary. [Citation.] A confession is involuntary only if the coercive police conduct at issue and the defendant's statement are causally related. [Citations.]" (*People v. Cunningham* (2015) 61 Cal.4th 609, 643.) "Coercive police tactics by themselves do not render a defendant's statements involuntary if the defendant's free will was not in fact overborne by the coercion and his decision to speak instead was based upon some other consideration. [Citations.]" (*People v. Rundle* (2008) 43 Cal.4th 76, 114 (*Rundle*), disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 (*Doolin*).) " 'The requisite causal connection between promise and confession must be more than "but for":

---

³ "[A] confession properly may be classified as an involuntary or coerced confession without regard to its reliability [citation] . . . ." (*People v. Cahill* (1993) 5 Cal.4th 478, 507; see *Colorado v. Connelly* (1986) 479 U.S. 157, 167 [In the absence of "any coercion brought to bear on the defendant by the State," the admissibility of an allegedly unreliable confession is "a matter to be governed by the evidentiary laws of the forum [citation] and not by the Due Process Clause"].)

causation-in-fact is insufficient.' (*People v. Benson* (1990) 52 Cal.3d 754, 778.) 'This rule raises two separate questions: was a promise of leniency either expressly made or implied, and if so, did that promise motivate the subject to speak?' (*People v. Vasila* (1995) 38 Cal.App.4th 865, 873.)" (*People v. Tully* (2012) 54 Cal.4th 952, 986.) "[W]here a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law. [Citation.]" (*People v. Boyde* (1988) 46 Cal.3d 212, 238, affd. sub nom. *Boyde v. California* (1990) 494 U.S. 370.)

"On appeal, we review independently the trial court's determination on the ultimate legal issue of voluntariness. (*People v. Benson*, *supra*, at p. 779.) But any factual findings by the trial court as to the circumstances surrounding an admission or confession, including ' "the characteristics of the accused and the details of the interrogation" (*Schneckloth v. Bustamonte* [ (1973) ] 412 U.S. [218], 226),' are subject to review under the deferential substantial evidence standard. (*People v. Benson*, *supra*, at p. 779.)" (*Williams*, *supra*, 16 Cal.4th at pp. 659-660.)

3. *Analysis*

Smith's assurances at the outset of the June 20, 2011 interview that defendant was free to leave and Smith would not arrest him appear aimed at making clear to defendant that he was not in custody. Defendant continued to maintain that he had done nothing.

Throughout the interview, Smith expressed sympathy for and understanding of defendant and told defendant that he was not a bad person. He spoke to defendant in a very calm, respectful and conversational way and created an atmosphere of trust. It is not "inherently coercive for an interrogator to attempt to form a rapport with the suspect." (*People v. Williams* (2010) 49 Cal.4th 405, 447.) "Expressions of sympathy by an officer are not coercive. [Citation.]" (*U.S. v. Rojas-Martinez* (5th Cir. 1992) 968 F.2d 415, 418.) Smith repeatedly appealed to defendant's sense of decency and stressed the

12

importance of honesty.  It is not inherently coercive to persuade a suspect to confess by appealing to his better nature.  (See *Carrington*, *supra*, 47 Cal.4th at pp. 175-176.)

Defendant initially maintained that he had done nothing.  He made an initial incriminating statement very shortly after Smith told him that an exam of the victim had produced evidence.  "The use of deceptive statements during an interrogation does not invalidate a confession as involuntary unless the deception is of a type reasonably likely to produce an untrue statement.  (*Williams*, *supra*, 49 Cal.4th at p. 443; *Carrington*, *supra*, 47 Cal.4th at p. 172; *People v. Jones* (1998) 17 Cal.4th 279, 299.)"  (*People v. Scott* (2011) 52 Cal.4th 452, 481.)  Smith's claim that an exam of Y. had produced incriminating evidence was not the type of ruse reasonably likely to induce defendant to make untrue statements.  (See *People v. Farnam* (2002) 28 Cal.4th 107, 182 [police falsely told defendant that his fingerprints had been found on victim's wallet]; *People v. Thompson* (1990) 50 Cal.3d 134, 167, abrogated on another ground in *People v. Cahill* (1993) 5 Cal.4th 478, 509-510 [officers falsely told defendant that there was incriminating evidence].)

Defendant indicated that he had done something once six months ago, as he had told Y.'s mother, and he promised that he would not do it again.  He began to say "after this, if I have to go to jail—"; Smith interjected that his word was good.  Defendant nevertheless volunteered that if he had to pay a price for that, he would pay it.  Defendant subsequently indicated that he really felt bad and again stated that if he had to pay for what he did, he had to pay.  Smith again said his word was good and defendant was going to walk out of there free.  Defendant clarified that he was being honest, not because Smith said he was going to let him go, but because he wanted to "let it go" and "start the life."  Defendant indicated that he was telling Smith about what happened because everybody is responsible for his own actions.  Later, when Smith thanked defendant for staying around and talking with him, defendant responded that he "just wanted to take everything out [*sic*] of [his] back too."

13

A law enforcement officer potentially creates a coercive situation by indicating to an interviewee or suspect that the officer will not arrest the person no matter what he says and the person is free to go at any time. The semantic difference between a promise made by an officer, who ostensibly speaks on behalf of the authorities, to not arrest the person no matter what he says and a promise that the person will never be arrested may be too fine a distinction in some circumstances. In some situations, an officer's promise that an interviewee will not be arrested no matter what he says might be understood as a promise that the state will not prosecute him.

In this case, however, defendant indicated his belief in being responsible for his own actions and his willingness to accept punishment for his acts regardless of Smith's promises. It is apparent that defendant did not view the exchange between Smith and himself as containing a promise of leniency. (Cf. *People v. Clark* (1993) 5 Cal.4th 950, 989, disapproved on another ground in *Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.) Defendant expressed guilt for what he had done and relief at divulging what had happened. Smith's promises not to arrest defendant were not a motivating cause of defendant's incriminating statements. (See *Connelly*, *supra*, 479 U.S. at p. 164 ["Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law. [Fn. omitted.]"]; cf. *Williams*, *supra*, 16 Cal.4th at p. 661 [detective's suggestion that district attorney might not seek death penalty if defendant cooperated in the investigation did not render admissions involuntary because it was not the motivating cause]; *Rundle*, *supra*, 43 Cal.4th at pp. 119-120 [defendant decided to confess to three murders based upon his belief that a person should cooperate with the authorities and tell them what he knows about a crime; he never believed he would receive the help discussed].)

Smith repeatedly urged defendant to be honest and to get the matter off his shoulders. "Mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or a promise, does

14

not . . . make a subsequent confession involuntary. [Citation.]" (*People v. Boyde*, *supra*, 46 Cal.3d at p. 238.) "[W]hen law enforcement officers describe the moral or psychological advantages to the accused of telling the truth, no implication of leniency or favorable treatment at the hands of the authorities arises. [Citation]" (*Carrington*, *supra*, 47 Cal.4th at p. 172.) In *People v. Jackson* (1980) 28 Cal.3d 264, 299, disapproved on another ground in *People v. Cromer* (2001) 24 Cal.4th 889, 901, footnote 3, the California Supreme Court determined that an officer's "statement that defendant would 'feel better' if he confessed" did not constitute "any promise of benefit other than the psychological benefit which 'flows naturally from a truthful and honest course of conduct' [citation]."

Smith encouraged defendant to disclose more by suggesting defendant think about Y. in light of his own experience of being molested as a child and continued to speak to defendant about what had happened in a respectful and frank way. As the California Supreme Court has recognized, " '[t]he compulsion to confess wrong has deep psychological roots, and while confession may bring legal disabilities it also brings great psychological relief.' (*People v. Andersen* (1980) 101 Cal.App.3d 563, 583-584, fn. omitted.)" (*Carrington*, *supra*, 47 Cal.4th at p. 176 [detective's comments that sought to "evoke defendant's better nature by persuading her that 'purg[ing] it all' was morally the right thing to do and would provide her with psychological relief" was not coercive].)

Contrary to defendant's assertion, Smith did not make any representations regarding the legal effect of confessing to more than one offense. He simply urged defendant to be completely truthful no matter how many incidents there were.

The interview was not unduly long, lasting approximately two and a half hours. Defendant was not in custody and he was free to terminate the interview at any time. Defendant was a 31-year-old man. He moved to the United States when he was 10 years old but he had learned English and he had attended high school and his classes had been in English. Defendant expressed himself well in English. He had worked for the same

15

employer for almost four years. Even though defendant and Y.'s mother did not live together, defendant helped care for their son, who was about one year old. There was no evidence that defendant had any special vulnerabilities based on immaturity, his level of intelligence, or a mental or physical disorder or disability that would make him especially susceptible to police influence. Smith told defendant to ask for anything he needed, Smith inquired whether defendant was "doing okay," and he offered and provided defendant with water.

Based upon the totality of circumstances, we conclude that defendant's incriminating statements were not motivated by Smith's promises that defendant was free to leave at any time and he would not arrest defendant. Therefore, defendant's incriminating statements were not involuntary in violation of due process and were admissible.

B. *Alleged Ineffective Assistance of Counsel*

Defendant argues that his right to effective assistance of counsel under the Sixth Amendment to the United States Constitution was violated by his defense counsel's "uninformed decision" to rely on Dr. Brodie, a child sexual abuse accommodation syndrome expert, on the issue of the falsity of his confession and by his counsel's failures to (1) sufficiently investigate potential false-confession evidence that could be provided by an expert and the requirements for introducing that evidence and (2) retain a false confession expert and call such expert as a witness to testify regarding false confessions.

To prevail on an ineffective assistance of counsel claim, a defendant must satisfy a two-part test by establishing both counsel's deficient performance and prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) As to deficient performance, a defendant "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Id.* at p. 688.) "Judicial scrutiny of counsel's performance must be highly deferential," a

16

court must evaluate counsel's performance "from counsel's perspective at the time" without "the distorting effects of hindsight," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Id*. at p. 689.) "If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)" (*People v. Gray* (2005) 37 Cal.4th 168, 207.)

The prejudice prong requires a defendant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid*.)

"In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. [Citations.] Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different. [Citation.] This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.' [Citation.] The likelihood of a different result must be substantial, not just conceivable. [Citation.]" (*Harrington v. Richter* (2011) 562 U.S. 86, 111-112.)

The United States Supreme Court has made clear that "[t]he object of an ineffectiveness claim is not to grade counsel's performance" and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . , that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697.) It is unnecessary to "address both components of the inquiry if the defendant makes an insufficient showing on one." (*Ibid*.)

17

"[N]ormally a claim of ineffective assistance of counsel is appropriately raised in a petition for writ of habeas corpus [citation], where relevant facts and circumstances not reflected in the record on appeal, such as counsel's reasons for pursuing or not pursuing a particular trial strategy, can be brought to light to inform the two-pronged inquiry of whether counsel's 'representation fell below an objective standard of reasonableness,' and whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694.)" (*People v. Snow* (2003) 30 Cal.4th 43, 111.)

The appellate record does not tell us whether trial counsel would have found a false-evidence expert available to testify at defendant's trial, what such a false-confession expert would have said if called as a witness, and whether and to what degree such expert testimony would have helped defendant's case. One commentator has observed: "There is no one cause, logic, or type of false confession. Rather, police-induced false confessions are the product of a multiple step process of influence, persuasion, and compliance. They usually involve psychological coercion. Under certain conditions of interrogation, police are more likely to elicit false confessions, and certain types of individuals are more vulnerable to interrogation pressure and, thus, are more easily manipulated into giving false confessions." (Jon B. Gould & Richard A. Leo, One Hundred Years Later: Wrongful Convictions After A Century of Research (2010) 100 J. Crim. L. & Criminology 825, 844, fn. omitted.)

Defendant has not demonstrated that there is a reasonable probability that the result of the trial would have been different if his trial counsel had explored the option of using a false-confession expert, retained such expert, and then called such expert to testify at defendant's trial. (See *Strickland*, *supra*, 466 U.S. at p. 694.) There was no other evidence that called into question the truth of defendant's incriminating statements. Moreover, a mere showing of some conceivable effect on the outcome of the proceeding

18

is not sufficient to establish prejudice. (See *id*. at p. 693.) Defendant has not carried his burden of establishing ineffective assistance of counsel.

C. *Sufficiency of the Evidence of Penetration*

1. *Background*

Defendant asserts that the evidence "supports no more than speculation or suspicion" that he penetrated Y.'s vagina with his penis during the June 19, 2012 incident and, therefore, the evidence is insufficient to prove the element of penetration with respect to that incident. He claims that count 5 "addressed" that incident, pointing to the prosecutor's suggestion during closing argument that "Count 5 be considered the last event, the June 19th incident." Defendant asserts that nothing in Y.'s statements or testimony establishes that defendant penetrated Y.'s vagina with his penis on June 19, 2012. Even if we assume that the prosecutor's remark constituted an election,[4] we disagree that the evidence is insufficient to prove penetration.

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Barnes* (1986) 42 Cal.3d 284, 303; *People v. Johnson* [(1980)] 26 Cal.3d [557,] 576-578.) On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*Johnson*, *supra*, 26 Cal.3d at pp. 576-577.)" (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

"We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the

---

[4] The trial court gave a unanimity instruction.

19

judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.]  If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]"  (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639 (*Jennings*).)  "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]  Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.  [Citations.]"  (*People v. Jones*, *supra*, 51 Cal.3d at p. 314.)

2.  *Evidence*

In this case, the DVD recordings of Smith's June 20, 2012 interview of Y., Smith's June 20, 2012 interview of defendant, and Trish Martinez's June 22, 2012 interview of Y. were played for the jury and admitted into evidence.  During the June 20, 2012 interview, Y. indicated that defendant was her dad and his name was Belmar. Smith asked Y., why she was there that day and why she was at the police department? She answered, " 'Cause my dad did something bad."  When Smith asked Y. to tell him more about that, Y. stated that they went to Christmas Hill Park and she and her cousin "got wet" and then they "went to the house."  She was changing and her "dad did something bad to [her]."  She said, "He grabbed me and he put me on the bed and he got on top of me."  She reported, "Then he got naked," "then he got me naked," and "then he got on top of me naked."  When Smith asked Y. to tell him more about her dad getting on top of her naked, Y. said she did not know what to say.  When Smith asked Y. to tell him what happened next after her dad got on top of her, Y. said, "That's all."  When Smith asked Y. to tell him more about how she felt when her dad got on top of her, she said sad. She reported that defendant said her cousin got on top of her but her cousin did not do that and defendant was lying.

Smith asked Y. to tell him more about Belmar, which is what she calls defendant. Y. said, "When he goes to work and I'm sleeping, he does it too." Smith told Y. to tell him more about what he does. Y. said, "Even when my mom goes to sleep, he does it too in the night." Smith told Y. to tell him what he does. Y. replied, "He does nasty stuff." Smith asked Y. to explain what "nasty stuff" is so he could understand. Y. said, "He rapes me." When asked what that means, Y. said "[t]hat means that he gets on top of you and that means that that's nasty."

Smith asked Y. to tell him what Belmar tells her. Y. told Smith that defendant tells her "[t]o not tell [her] mom." He asks her, "Do you like it?" She says no.

Y. told Smith that her cousin saw Belmar get on top of her from the window. Smith said, "I'm not sure I understand how he gets on top of you. Tell me about that." Y. replied, "He just gets on top of me and puts me on the bed."

In the redacted DVD recording of Smith's June 20, 2012 interview of defendant that was played for the jury, defendant admitted that on five or six occasions he had put his penis inside Y.'s vagina but not more than an inch. Defendant also admitted that, on one of those occasions, he had put his penis in Y.'s "butt" a little bit after he put his penis in her vagina. According to defendant, the first incident occurred during about October 2011 and a second incident occurred shortly before Christmas in December 2011 and followed his bathing of Y. Defendant claimed that the most recent incident had occurred probably about a month before the interview but not on June 19, 2012. But when Smith indicated that Y. had an exam that day that showed "evidence" and asked whether that made sense to defendant, defendant replied, "Yeah." At trial, defendant's letters to Y. and Y.'s mother, which he wrote during the interview with Smith and in which he asked for their forgiveness, were also admitted into evidence.

Martinez's June 22, 2012 interview of Y. at the Children's Interview Center, was played for the jury. During that interview, Y. told Martinez that she was six years old. When Martinez asked Y. why she had come to talk to her, Y. indicated that her "dad did

21

something bad to [her]." Y. said that her cousin, her brother and his friends, and she went to Christmas Hill Park. Another cousin and she were wet and they went home in the van. Y. told Martinez that she was changing and her dad came in, put her on the bed, and then he got on top of her. Her clothes were off because her dad took them off. Her dad's clothes were on but his clothes were off when he got on top of her. She indicated that defendant's underwear was on.

Y. indicated that her cousin saw her dad get on top of her. She said that her dad thought her cousin got on top of her but her cousin did not.

When Martinez asked Y. what happened when her dad got on top of her, Y. said, "I was on my back, then he got on top of me and I was naked." Y. made an "x" on a diagram of a girl to show where defendant had touched her body on the front. Y. made an "x" on a diagram of a boy to show the part of defendant's body with which defendant touched her body on the front. She did not have names for those parts. On the diagrams, Y. had marked the boy's penis and the girl's groin area. When defendant touched his body part to her body part, it made Y. feel sad.

Y. made an "x" on a diagram of a girl to show where defendant had touched her on the back of her body. Y. marked the girl's buttock and her name for that part was "butt." Y. indicated by pointing to the diagram of a boy that defendant used his penis to touch her "butt."

Y. indicated that the part she had marked on the diagram of the girl's front was used to "do potty." Pointing to the boy's penis marked on the diagram of the boy, Martinez asked, "Did he put this in where you go potty?" Y. nodded yes. Y. indicated that the part she had marked on the diagram of the girl's back was used to go "poo-poo." Pointing to the boy's penis marked on the diagram of the boy, Martinez asked, "[D]id he put that part of his body in where we go poo-poo." Y. nodded yes. When asked how did that feel, Y. said sad.

22

Y. indicated that similar incidents had happened more than one time but less than five times. By a shake of her head, Y. indicated that she did not know how many times it had happened. Her dad told her to not tell her mom but she did. He asked her if she liked it and Y. said no.

Y. indicated that it happened other times on the bed. When asked if it ever happened anywhere else, Y. indicated that it happened "one time" "[a]t his mom's house." It happened "a long time ago" when her teachers were Mrs. Gonzales and Mrs. Ramos. Defendant "got on top of [her] at his mom's house." Her clothes were on. Y. said, "He started raping me." She explained that "raping" means that "he gets on top of you and he goes like up and down" and "back and forward." In response to Martinez's questions, Y. indicated by nodding or saying yes that defendant's part of his body that she had marked with an "x" on the diagram of a boy was going into the parts of her body she had previously marked with an "x" on the diagram of a girl.

Martinez asked Y. how her clothes "get off" when she was naked on the bed with her dad on top of her. Y. answered, "He takes them off." When that was happening, her mother was walking home with her brother.

At the conclusion of Martinez's interview with Y., Smith collected the boy and girl diagrams that Y. had marked and booked them into evidence. They were admitted into evidence at trial.

At trial, D. Doe (hereafter D.), who said he was six at the time of trial, remembered going to Christmas Hill Park with defendant and playing in the water with Y. D. went home in defendant's car. Y. lived next door to D. and she went to her home. D. changed his clothes and then he went to Y.'s house. The door, which was usually unlocked, was locked, which seemed "weird" to him.

D. testified that he moved the curtain and looked through the window of Y.'s house. He saw defendant and Y. on the bed inside the house. Y.'s clothes and defendant's clothes were off. Using a diagram of a boy, D. indicated the defendant was

23

using his penis to touch Y.'s "butt." D. told his mother and Y.'s mother what he had seen and, at trial, he testified that he told them the truth. D. denied touching Y.

On cross-examination, D. testified that Y. had her pants on and defendant was wearing shorts when D. looked through the window. Y. was on the bed and defendant was on top and they were kissing. Defendant opened the door and D. went into Y.'s house. D. then went to tell his mother everything. Defendant told D.'s mother that he caught D. with his pants down, which was not true.

D. remembered telling Smith that he saw defendant "peeing" on Y. when he looked in the window. The "pee" was yellow.

At trial, Y. testified that she was seven years old and in second grade. Her kindergarten teachers were "Ms. Gonzales and Ms. Ramos."

Y. and her cousin D., who was then six years old and lived next door to her, used to play in the water at Christmas Hill Park. She said she did not remember a time when D. saw defendant do something to her but she did remember that defendant was there when she came home from the park. She indicated that when she came home from the park, she took off her wet clothes and no one helped her take them off. When she was asked whether any part of defendant's body touched a part of her body when she was changing her clothes after Christmas Hill Park, Y. answered "yeah." Using diagrams of a girl and a boy, Y. indicated that defendant touched her groin area with his penis. When asked if defendant had ever touched her body with that part of his body before, Y. said she did not remember and she did not know.

On cross-examination, Y. confirmed that she came back from the park in a car with defendant. Y. changed her clothes in her mom's room and defendant was in the room.

Y.'s mother testified that, on June 19, 2012, defendant, Y., D., and she went to Christmas Hill Park and Y. and D. played in the water. At the park, they undressed Y. and defendant wrapped Y. and D. together in a towel. Defendant took Y. and D. home in

24

a van and Y.'s mother walked home. When she arrived, D. told her that he saw defendant doing things to Y. Defendant said that D. was lying.

D.'s mother testified that D. told her that he saw defendant put his penis in Y.'s "butt" on June 19, 2012.

Mary Lou Ritter, a physician's assistant and the clinic coordinator and primary examiner at the Center for Child Protection at Valley Medical Center, testified as an expert on the physical examination of children suspected of being victims of child sexual abuse. Ritter performed a physical examination of Y. on June 20, 2012 but she did not find anything unusual. In her opinion, it is not unusual to not find tears or bruising if a man pushed his penis just a small way inside a child's vagina.

Defendant testified regarding his version of what happened after returning from the park on June 19, 2012. He indicated that D. ran home and told his mother that defendant was putting his "lulu" or penis in Y.'s behind. D. also told Y.'s mother.

During telephone calls from Y.'s mother on June 20, 2012, Y.'s mother confronted defendant about what had allegedly happened the previous day. Defendant remembered that he admitted to her that he had touched Y. on her private part one time about six months earlier. He testified that he had been speaking about a time he had been giving her a bath.

3. *Analysis*

Defendant admitted during the interview with Smith that on about six occasions he put his penis inside Y.'s vagina but penetrated no more than an inch. Defendant further admitted that once he put his penis inside Y.'s "butt" and that occurred after he put his penis in her vagina. With regard to the incident after returning from the park, Y. had indicated to Martinez that defendant had put his penis into the parts she uses "do potty" and go "poo-poo." The evidence indicated that D. had seen defendant put his penis in Y.'s "butt." During the interview with Smith, defendant indicated that it made sense to him that an exam on June 20, 2012 produced "evidence." The jury could reasonably

25

infer from all the evidence that the incident on June 19, 2012 after returning from the park was the occasion on which defendant admittedly penetrated Y.'s genital and anal openings with his penis.

Defendant's statement to Smith that the last incident occurred probably about a month before the interview does not preclude the jury from determining that the last incident actually occurred on June 19, 2012 and it was the incident in which defendant admittedly engaged in both sexual intercourse and sodomy. The jury determines "the effect and value of the evidence addressed to it, including the credibility of witnesses and hearsay declarants." (Evid. Code, § 312, subd. (b).) A jury is free to believe some of a defendant's statements and disbelieve other statements. (See *People v. Wader* (1993) 5 Cal.4th 610, 641.) "[C]onfessions stand upon the same footing as other evidence and are to be weighed by the jury in the same manner. All parts are not necessarily entitled to the same credit, and the jury may believe a part and reject the remainder of a confession. [Citation.]" (*People v. Garcia* (1935) 2 Cal.2d 673, 679.)

To find defendant guilty of the crime charged in count 5, the prosecution was required to prove slight penetration beyond a reasonable doubt. (See *People v. Dunn* (2012) 205 Cal.App.4th 1086, 1097 [conviction of violating § 288.7, subd. (a) by sexual intercourse required "penetration of [victim's] labia majora, not her vagina"]; cf. *People v. Quintana* (2001) 89 Cal.App.4th 1362, 1364 ["Sexual penetration," which is defined by § 289, subd. (k)(1) to include the act of causing the penetration, however slight, of the genital opening, "refers to penetration of the labia majora, rather than penetration of the vagina."]; *People v. Karsai* (1982) 131 Cal.App.3d 224, 232 ["Penetration of the external genital organs is sufficient to constitute sexual penetration" and vaginal penetration is not necessary to commit a rape], disapproved on another ground by *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8; § 263 ["Any sexual penetration, however slight, is sufficient to complete the crime" of rape].) The court instructed that "[s]exual intercourse means any penetration, no matter how slight, of the vagina or genitalia by the penis."

26

Viewing the evidence in the light most favorable to the judgment, we conclude that there was sufficient evidence of penetration to support the jury's guilty verdict on count 5.

*D. Failure to Instruct Sua Sponte on Attempt as a Lesser Included Offense*

Defendant contends that the trial court erred by failing to instruct sua sponte on an attempted violation of section 288.7, subdivision (a), as a lesser included offense to the crime charged in count 5.  "On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense. (See, e.g., *People v. Waidla* (2000) 22 Cal.4th 690, 739.)"  (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

"A trial court has a sua sponte duty to 'giv[e] instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)"  (*People v. Eid* (2014) 59 Cal.4th 650, 656.)  "For purposes of determining a trial court's instructional duties, [the California Supreme Court has] said that 'a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.  [Citations.]' [Citations.]"  (*People v. Smith* (2013) 57 Cal.4th 232, 240 (*Smith*).)

"Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former."  (*People v. Reed* (2006) 38 Cal.4th 1224, 1227.)  "Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former.  [Citation.]"  (*Id.* at pp. 1227-1228.)  "[S]o long as the prosecution has chosen to allege a way of committing the greater offense that necessarily subsumes a lesser offense, and so long as

27

there is substantial evidence that the defendant committed the lesser offense without also committing the greater, the trial court must instruct on the lesser included offense." (*Smith*, *supra*, 57 Cal.4th at p. 244.)

Section 288.7, subdivision (a), makes it a crime for "[a]ny person 18 years of age or older" to "engage[] in sexual intercourse or sodomy with a child who is 10 years of age or younger . . . ." Count 5 charged defendant with "the crime of SEXUAL INTERCOURSE OR SODOMY WITH A CHILD 10 YEARS OF AGE OR YOUNGER, in violation of PENAL CODE SECTION 288.7(a), a Felony," which was "committed by [defendant] who, as a person 18 years of age or older, did engage in sexual intercourse with a child, [Y.], who was 10 years of age or younger, namely, 6."

A violation of section 288.7, subdivision (a), is a general intent crime, not a specific intent crime. "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent." (*People v. Hood* (1969) 1 Cal.3d 444, 456-457.) "When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." (*Id.* at p. 457) "Language that typically denotes specific intent crimes, [includes phrases] such as 'with the intent' to achieve or 'for the purpose of' achieving some further act . . . . [Citation.]" (*People v. Atkins* (2001) 25 Cal.4th 76, 86 (*Atkins*).) Unlike section 288.7, subdivision (b), section 288.7, subdivision (a), does not incorporate any specific intent element by reference to a definition contained in another statute.[5]

---

[5] Section 288.7, subdivision (b), provides: "Any person 18 years of age or older who engages in oral copulation or sexual penetration, as defined in Section 289, with a child who is 10 years of age or younger is guilty of a felony and shall be punished by imprisonment in the state prison for a term of 15 years to life." Section 289, subdivision (k)(1), defines "sexual penetration" as "the act of causing the penetration, however slight, of the genital or anal opening of any person or causing another person to (continued)

28

"An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a, added by Stats.1986, ch. 519, § 1, p. 1859.) Accordingly, an attempt to violate section 288.7, subdivision (a), is a specific intent crime whereas the completed crime is a general intent crime. Under the elements test, an attempt is not a lesser included offense of a general intent crime "because the attempted offense includes a specific intent element not included in the complete offense. (*People v. Strunk* (1995) 31 Cal.App.4th 265, 271 ['an attempt is a specific intent crime and does not fit within the definition of a necessarily included offense of a general intent crime']; *People v. Bailey* [(2012)] 54 Cal.4th [740,] 749.)" (*People v. Ngo*, *supra*, 225 Cal.App.4th at pp. 156-157.)

Defendant nevertheless argues that an attempted crime may be considered a lesser included offense of a general intent crime, citing *Atkins*, *supra*, 25 Cal.4th at p. 88,[6] *People v. Martinez* (1999) 20 Cal.4th 225, 241(*Martinez*),[7] and *People v. Kelly*, *supra*, 1

---

so penetrate the defendant's or another person's genital or anal opening *for the purpose of sexual arousal*, *gratification*, *or abuse* by any foreign object, substance, instrument, or device, or by any unknown object." (Italics added.) Thus, a violation of section 288.7, subdivision (b), by an act of sexual penetration is a specific intent crime. (See *People v. Ngo* (2014) 225 Cal.App.4th 126, 157.)

[6] In *Atkins*, *supra*, 25 Cal.4th 76, the trial court instructed the jury that voluntary intoxication was not a defense to arson and did not relieve the defendant of responsibility for the crime. (*Id*. at p. 81.) On appeal, the defendant argued that evidence of voluntary intoxication was admissible to show that he lacked the requisite mental state for arson. (*Ibid*.) The California Supreme Court held that arson (§ 451) is a general intent crime and, therefore, evidence of voluntary intoxication is not admissible under former section 22 on the issue of whether defendant formed the requisite mental state for that crime. (*Atkins*, *supra*, at p. 79.) In its analysis, the court stated that "[t]he fact that reckless burning is a lesser offense of arson is . . . not dispositive" of whether arson is or is not a specific intent crime. (*Id*. at p. 88.) The court then said: "For example, attempted rape, a specific intent crime, is a lesser included offense of rape, a general intent crime. (*People v. Osband* (1996) 13 Cal.4th 622, 685; *People v. Kelly* (1992) 1 Cal.4th 495, 526, 528.)" (*Ibid*.)

[7] In *Martinez*, *supra*, 20 Cal.4th 225, the defendant was charged with, among other crimes, kidnapping (former § 207, subd. (a)) and the kidnapping charge alleged the (continued)

29

Cal.4th at p. 528 (*Kelly*).[8]  None of those cases considered the issue whether an attempted violation of section 288.7, subdivision (a), it is a lesser included offense of the completed crime under the elements or accusatory pleading test for the purpose of determining a trial court's sua sponte duty to instruct on lesser included offenses.

"An appellate decision is not authority for everything said in the court's opinion but only 'for the points actually involved and actually decided.' [Citations.]" (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620.)  " '[C]ases are not authority for propositions not considered.' [Citation.]" (*Jennings*, *supra*, 50 Cal.4th at p. 684.)

Defendant argues that "[i]t is axiomatic that in actually committing the crime, one is necessarily engaging in all the actions necessary to be guilty of an attempt, if one is interrupted."  Insofar as this is an argument that an attempted violation of section 288.7, subdivision (a), is necessarily a lesser included offense of the completed crime, defendant is mistaken.

In *People v. Bailey*, *supra*, 54 Cal.4th 740 (*Bailey*), "[t]he Attorney General contend[ed] that attempt to escape is a lesser included offense of escape, and that therefore an appellate court has the statutory power, under sections 1181, subdivision 6, and 1260, to reduce the escape conviction to attempt to escape." (*Id*. at p. 747.)  Although the California Supreme Court recognized that the "cases relied on by the

_____

victim was under 14 years of age (former § 208, subd. (b)).  (*Martinez*, *supra*, at p. 230.)  The California Supreme Court concluded that the evidence was insufficient to support the verdict for simple kidnapping based on the movement of the victim but the evidence showed that defendant was guilty of attempted kidnapping of a person under the age of 14 (*id*. at p. 229).  The court reduced "the conviction to the lesser included offense of attempted kidnapping of a person under the age of 14." (*Id*. at p. 241.)

[8] In *Kelly*, *supra*, 1 Cal.4th 495, the trial court erroneously instructed the jury that it was legally possible to rape a dead body (*id*. at p. 526) and "the physical evidence suggested the possibility of intercourse after death" (*id*. at p. 527).  To address that instructional error, the California Supreme Court reduced the rape conviction to attempted rape because the error would not have "affected a conviction of the lesser included offense of attempted rape." (*Id*. at p. 528.)

30

Attorney General have stated or applied the general principle that attempt is a lesser included offense of any completed crime," it found the principle was not applicable "where the attempted offense includes a particularized intent that goes beyond what is required by the completed offense." (*Id.* at p. 753.)

"*Bailey* thus highlights a nonintuitive aspect of the relationship between attempts and completed crimes: while it might seem an attempt would naturally be a lesser included offense, this is not necessarily so. Attempts are only lesser included offenses if the sole distinction between the attempt and the completed offense is completion of the act constituting the crime. (*People v. Ngo* (2014) 225 Cal.App.4th 126, 156 (*Ngo*).) If the attempt requires a heightened mental state, as is the case with attempts of many general intent crimes, the attempt requires proof of an additional element and is therefore not a lesser included offense. (*Bailey*, *supra*, 54 Cal.4th at p. 753 ['where the attempted offense includes a particularized intent that goes beyond what is required by the completed offense,' it is not a lesser included offense]; *People v. Strunk* (1995) 31 Cal.App.4th 265, 271 ['an attempt is a specific intent crime and does not fit within the definition of a necessarily included offense of a general intent crime']; *Ngo*, at p. 156 ['when the completed offense is a general intent crime, an attempt to commit that offense does not meet the definition of a lesser included offense under the elements test because the attempted offense includes a specific intent element not included in the complete offense'].)" (*People v. Braslaw* (2015) 233 Cal.App.4th 1239, 1248, review denied Apr. 15, 2015, S224778 [under the elements test, attempted rape of an intoxicated person is not a lesser included offense of rape of an intoxicated person].)

Count 5's allegations track the statutory language of section 288.7, subdivision (a). No additional allegation of specific intent is included. Therefore, the accusatory pleading test does not assist defendant and we must apply the elements test. (See *People v. Anderson* (1975) 15 Cal.3d 806, 809.) As explained, an attempted violation of section 288.7, subdivision (a), is not a lesser included offense of the completed crime

31

under the elements test because the attempt requires proof of specific intent while the completed crime has no such element. Consequently, the trial court had no sua sponte duty to instruct on an attempt to violate section 288.7, subdivision (a), as a lesser included offense of the charged crime regardless of the evidence.

## DISPOSITION

The judgment is affirmed.

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.


_____

WALSH, J.*